## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES, ex rel. SHARON MCKINNEY | : | |
| | : | |
| | : | |
| Plaintiffs, | : | Filed in camera and under seal |
| | : | pursuant to the False Claims |
| V. | : | Act, 31 U.S.C. §3729 et seq. |
| | : | |
| DHS TECHNOLOGIES  LLC | : | JURY TRIAL DEMANDED |
| DHS SYSTEMS LLC | : | |
| 33 Kings Highway | : | $11 - cv - 146$ |
| Orangeburg, NY 10962 | : | |
| | : | |
| And | : | |
| | : | |
| A. JON PRUSMACK | : | |
| 33 Kings Highway | : | |
| Orangeburg, NY 10962 | : | |
| and | : | **FILED** |
| IRVING COHEN | : | **SCRANTON** |
| 33 Kings Highway | : | |
| Orangeburg, NY 10962 | : | JAN 2 0 2011 |
| and | : | |
| NELSON WEINSTEIN | : | PER _____ |
| 33 Kings Highway | : | **DEPUTY CLERK** |
| Orangeburg, NY 10962 | : | |
| and | : | |
| SAM MARRONE | : | |
| 33 Kings Highway | : | |
| Orangeburg, NY 10962 | : | |
| and | : | |
| JEFF JACKSON | : | |
| 33 Kings Highway | : | |
| Orangeburg, NY 10962 | : | |

1

and                              :
JOHN BOHRMAN                     :
33 Kings Highway                 :
Orangeburg, NY 10962             :
      Defendants     :

---

## CIVIL COMPLAINT FILED PURSUANT TO
## THE FALSE CLAIMS ACT, 31 U.S.C. §3729 et seq.

Relator Sharon McKinney, by and through her attorney, files this

Complaint, under the False Claims Act, related to false submissions made by DHS

Technologies LLC, and related entities and persons, under procurement programs

funded by the Federal Government, via the Department of Defense and the

General Services Administration, and subject to regulations from, among others,

the Small Business Administration and the Environmental Protection Agency.

1.      This action arises out of Defendants' false or fraudulent conduct in

providing false information to the Federal Government, by way of the Department

of Defense ("DOD"), the General Services Administration ("GSA") of the United

States, and as a subcontractor to other federal contractors,  about defendants'

pricing practices and operations. As a result of Defendants' false representations

and the Government's reliance upon those false representations, GSA and DOD

were induced to enter into and maintain contract terms and conditions to which it

would not have agreed had Defendants accurately and truthfully disclosed their

2

practices to the Government.  As a result of Defendants' false claims submitted to the Government, the Government paid false claims and has been damaged.

2.      Specifically, defendant DHS violates the Small Business Association set asides for small businesses, as they do not qualify as a small business.  DHS has failed to offer the Government required, negotiated discounts by failing to notify the Government of discounts offered to private commercial customers in violation of GSA and other regulatory requirements; has overcharged the Government by failing to charge the Government at the negotiated prompt payment terms; has double charged for freight on purchases;  uses engines that are not EPA compliant with knowledge of this non-compliance; violates the Trade Agreements and Buy American Acts; violates Defense Federal Acquisition Regulations supplements restricting the purchase of ball bearings made outside of North America; and has double charged the Government for the travel costs of its personnel.  Due to these violations, each and every submission made by defendant DHS to the Federal Government contains false statements in violation of the False Claims Act.

3.      The facts and circumstances which give rise to Defendants' violations of the False Claims Act have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in

3

a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or in the news media. Relator Sharon McKinney is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein. Ms. McKinney provided disclosure of the allegations of her complaint to the United States prior to filing.

## A.   THE PARTIES

### Plaintiffs

4.    The United States of America is the real party in interest to the claims advanced in the Complaint.

5.    Sharon  McKinney is the plaintiff ex rel, or Relator, in this matter. Ms. McKinney was the Director of Contracting at defendant DHS, a position she has held for approximately three and one half years, from May, 2007 until she was escorted out of the building on November 4, 2010 . For the past twenty five years, Ms. McKinney has held positions related to government contracting for a variety of governmental contractors.

### Defendants

6.     DHS Technologies LLC is a Delaware corporation, formed in 2005.

DHS Systems, LLC, is a subsidiary of DHS Technologies, that performs all of the

billing and administrative functions of DHS Technologies (collectively, they are

referred to as "defendant DHS.")  The predecessor company, DHS Systems, was

founded in 1984.  DHS, or Deployable Hospital Systems, was formed by

defendant A. Jon Prusmack to provide quickly deployable, lightweight field

hospitals.  Today, DHS builds and sells deployable rapid assembly shelters, or

DRASH units; high technology soft walled shelter systems used by military or

government purposes; and the support and technology necessary to build and

maintain their products.  Defendant DHS is located in Orangeburg, NY, and does

business within the Middle District of Pennsylvania.

7.     Defendant DHS has several subsidiaries.  They include DHS Systems

LLC, the administrative arm of DHS that also manufactures Standard Integrated

Command Post Systems ("SICPS"), a military use quick-erect shelter system and

its infrastructure;  DHS Systems International Ltd (formerly known as Milsys UK

Ltd), a military and civilian quick-erect shelter system used in foreign countries;

Reeves EMS, a quick-erect shelter system for use by local municipalities in

emergency situations; and Reeves ICP ("Incident Command Post").

8.     Defendant DHS also has several subsidiaries that are in related or

5

unrelated businesses, but have the same officers and investors. Many of these subsidiaries are all managed and run out of DHS' Orangeburg, NY, offices.

8a.   American International Lifestyles ("AIL"), is a holding company for several subsidiaries: APOGEE Wellness, a health and wellness company that runs businesses under the names Pilates Pro (a Pilates exercise company), Power Pilates.com (a chain of Pilates exercise centers), and Myong Private Label Gourmet (a catering and café business to service its wellness centers).   AIL states on its website that it employs over 200 people.

8b.   Another subsidary run out of the defendant DHS' offices is American International Media, or AIM, which runs, among other things,  USA Sevens, a United States professional rugby competition; and Rugby Magazine and its subsidiary, rugbymag.com.

9.   Defendant A. Jon Prusmack is the President and Chief Executive Officer of defendant DHS.  He is also the CEO of AIL, APOGEE, AIM, and USA Sevens/ Rugby Magazine.

9a.   Defendant Prusmack, either directly or through his wife, Patrice Prusmack, has thirty five percent ownership interest in Ducts, Unlimited, Inc. (Website: www.ductsunlimitedus.com ).  Ducts Unlimited, in business since 2003,  makes all of the duct work used in defendant DHS tent and shelter projects,

6

for use with the environmental control units and systems.  Ducts Unlimited also manufactures duct work for non military use.  Ducts Unlimited's project manager is the former project manager of defendant DHS.   The former director of government contracting at defendant DHS is now the director of contracting at Ducts Unlimited.

9b.   In his role as CEO and president of defendant DHS, defendant Prusmack is and has been aware of the fraudulent activities alleged below, both through meetings with employees, email correspondence, and directions to employees to participate in the fraud.

10.   Defendant Irv Cohen, the chief financial officer of DHS, is also the President of AIL and APOGEE.  Defendant Cohen is also Chief Executive Officer of Southeast Capital Equity Group LLC (hereafter, "Southeast CEG"), "an investment banking firm that uses technology and its professional industry experience to help companies profitably expand their business...[offering] corporate finance and business advisory services to help companies reach their immediate and long-term goals."  Southeast CEG provides financing for defendant DHS.  Southeast's mailing address is  8875 Hidden River Parkway, Suite 300 , Tampa, FL 33637.

Southeast CEG, however, is operated out of defendant DHS' Orangeburg,

NY, location.  Defendant Cohen, along with defendant Nelson Weinstein, is physically in defendant DHS' offices Monday through Friday.  Southeast' telephone number is defendant Cohen's cell phone.

In his role as CFO of defendant DHS, defendant Cohen is and has been aware of the fraudulent activities alleged below, both through meetings with employees, email correspondence, and directions to employees to participate in the fraud.

11.    Defendant Nelson Weinstein is a vice president of defendant DHS, an accountant, and a consultant.  Defendant Weinstein serves as controller and chief accounting officer for defendant DHS.   Defendant Weinstein is also the chief operating officer of Southeast CEG.  According to the Southeast website, defendant Weinstein "is currently providing management and financial consulting guidance to a private equity funded manufacturing company with annual revenue in excess of $100 million."  Defendant Weinstein performs the tasks of Southeast CEG out of defendant DHS' Orangeburg, NY, office.

11b.   In his role as chief accounting officer, defendant Weinstein is and has been aware of the fraudulent activities alleged below, both through meetings with employees, email correspondence, and directions to employees to participate in the fraud.

8

12.   Defendant Sam Marrone is the chief operating officer of defendant DHS. Defendant Marrone joined DHS at the time that defendant DHS was partially sold to Carlyle Group.  In his role as COO, defendant Marrone is and has been aware of the fraudulent activities alleged below, both through meetings with employees, email correspondence, and directions to employees to participate in the fraud.   Defendant Marrone has condoned the fraudulent behavior and actions of defendant DHS, and has acted with knowledge of the false claims.

13.   Defendant Jeff Jackson is the vice president of business development at defendant DHS.  In his role, defendant Jackson was responsible for all Government contracting and subcontracting work.  Defendant Jackson was Ms. McKinney's direct supervisor, and as such was ultimately responsible for all products and services produced in response to the Government contracts and subcontracts.  Defendant Jackson is and was aware of the frauds described below. Defendant Jackson was at meetings where the fraud was discussed, and directed employees, including Ms. McKinney,  to continue performing fraudulent actions and omissions, regardless of what defendant DHS was required to do under its contracts with the Government.

14.   Defendant John Bohrman ("defendant Bohrman") is the controller of defendant DHS.  In that role, defendant Bohrman is aware of all expenditures and

9

income, and the functioning of all contracts in which defendant DHS is a party.

Defendant Bohrman is and was aware of the frauds described below. Defendant

Bohrman was at meetings where the fraud was discussed, and directed employees,

including Ms. McKinney, to continue performing fraudulent actions and

omissions, regardless of what defendant DHS was required to do under its

contracts with the Government.

15. In approximately 2004, The Carlyle Group bought a 30.5% share in

defendant DHS, and the company was renamed "DHS Technologies LLC." The

Carlyle Group maintains several seats on the defendant DHS board. Defendant

DHS' emails show that The Carlyle Group is copied on internal emails and

questions involving the day to day operations of the company.

## B.   BACKGROUND TO THE FALSE CLAIMS AT ISSUE

### 1.   THE APPLICABLE FEDERAL REGULATIONS

#### A.   General Contract Provisions

16. The Government, through GSA and DOD, among other agencies,

enters into agreements with contractors to purchase goods and supplies, as needed

for a variety of DOD and GSA programs. The competitive bidding process, and

the negotiation of contractual terms, is a lengthy and costly process. In order to

expedite the procurement process for executive agencies and contractors wishing

to sell products to executive agencies, the GSA, through the Federal Acquisition

Service, solicits, negotiates, awards, and administers contracts to procure

products and services for federal agencies. 41 U.S.C. § 251, et seq.; 40 U.S.C. §

501 (b).

17.    Under the Multiple Awards Schedule ("MAS") program, GSA

negotiates prices and contract terms that will apply to subsequent orders placed for

all of the items that are covered by the MAS contract. The list of products or

services that are available for purchase under a particular contract is referred to as

the contract "schedule." The pre-negotiation of the terms of sale for a large

number of products and services under the MAS program saves a significant

amount of administrative time for Government agencies ordering off of MAS

contract schedules and for contractors wishing to sell products to the Government.

18.    The MAS program allows the Government to obtain commercial

supplies and services at prices associated with volume buying. 41 U.S.C. §

259(b)(3).   Additionally, agencies placing orders under MAS contracts are

considered to meet the requirements of full and open competition. 48 C.F.R. §

8.404(a).   Contractors also benefit from the MAS program, because they do not

have to compete in sealed bidding or negotiated acquisitions for each individual

11

sale, and their products are more widely available to federal agencies, thus making it easier for the agencies to place orders.

19.   The Administrator of GSA establishes the procedures that govern the MAS program, including the requirements that contractors must follow in order to participate in the program. 40 U.S.C. §§ 121©, 501(b)(2). These rules and regulations are set forth in the Federal Acquisition Regulations (FAR) and the General Services Administration Acquisition Manual(GSAM).

20.   GSA initiates the process by publishing a contract solicitation. Interested contractors then submit responses to the solicitation to GSA. Any contractor that enters into an MAS contract with the United States Government must abide by 1) the obligations that are outlined in the Government's solicitation; 2) the FAR and GSAM clauses that are incorporated into the contract; 3) any additional requirements negotiated between the parties; and 4) any other general federal contracting requirements set forth in the applicable regulations.

21.   The MAS contract solicitation requires prospective contractors to provide MAS with extensive information about their commercial sales and practices, including price and discount information, and information related to the parts of the expenses for products, such as delivery, that are contained in the price structure.   GSA contracting officers use this information to negotiate MAS

12

contract prices.   Pursuant to 48 C.F.R. § 538.270(a), GSA contracting officers are required to "seek to obtain the offerer's best price (the best price given to the most favored customer)."   In negotiating the terms of an MAS contract, the contracting officer must determine whether the price offered to GSA is reasonable by comparing "the terms and conditions of the [offerer's response to the] MAS solicitation with the terms and conditions of agreements with the offerer's commercial customers." 48 C.F.R. § 538.270( c).   GSA contracting officers therefore rely heavily on the accuracy and truthfulness of the information provided by the offerer regarding its commercial sales, prices, and components of the prices, in negotiating the terms of an MAS contract. Id.

22.    The MAS contract provides that if, subsequent to formation of the contract, GSA discovers that the information provided to the contracting officer at the time of negotiation was not current, accurate, and complete, the Government is entitled to a reduction in the price of each order issued pursuant to the MAS contract. The amount of the reduction is the amount by which the Government orders were inflated as a result of the inaccurate or undisclosed information. 48 C.F.R. § 552.215-72; GSAM 552.238-75( c).

13

**B.    Small Business Administration Requirements.**

23.    The MAS, and other DOD and GSA contracts, also provide that the programs give preferential treatment to businesses deemed to be "small," according to SBA guidelines.   SBA provides assistance to small businesses seeking government contract work by providing additional opportunities to businesses which are independently owned and operated, not dominant in its field of operation, and does not exceed the size standard applicable to the procurement or program for which the business is applying.

24.    The SBA small business set asides were created

> to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

15 U.S.C.§631(a).

25.    The SBA sets the particular size a small business can be in order to participate in SBA programs, according to standards set by the North American Industry Classification Systems ("NAICS") codes.  These codes are set based upon the type of industry involved.  These codes are contained at 13 C.F.R. §121.104 and 106.

14

26.     When a contract is let with SBA small business set asides, the business must certify, in its response to proposals, its contracts, and in yearly reports, that it is a small business under the appropriate NAICS code.  15 U.S.C. §632.   Businesses that falsely certify compliance with, and eligibility for, small business set asides are subject to damages based upon the total value of the contract, and exclusion from future SBA programs for up to three years.  15 U.S.C. §632(w).   Any submission for federal funds under a SBA program is deemed a certification of small business eligibility.  Id.

## C.     The Environmental Protection Agency Requirements

27.     All GSA and DOD contracts are required to follow other governmental regulations, including the Environmental Protection Act.   The Government contracts with companies such as defendant DHS, for the provision of end products that contain engines, such as those used with non-road equipment. All engines used in non-road equipment must be certified by EPA as compliant with federal emissions standards under the Clean Air Act.  See, 42 U.S.C. 7401-7671; 40 C.F.R. §1048.101-105.

28.     Certified engines must bear a permanently affixed EPA emissions label, stating what level of emissions the particular engine produces.  40 C.F.R.

§1048.135. This certification must be determined by the engine manufacturer. Imported engines that fail to meet emissions standards are subject to seizure and fines. Both the manufacturer and importer of the nonroad engines are responsible for ensuring EPA certification.

### D.   Trade Agreements Act, and Buy American Act

29.   All Government purchases must also qualify under the Trade Agreements Act, and Buy American Act.

30.   The Trade Agreements Act of 1979, 19 U.S.C. § 2501, *et. seq.*, provides for the approval and implementation of "trade agreements negotiated under the Trade Act of 1974." *Id.* at § 2502 (1), with the goal of fostering "the growth and maintenance of an open world trading system." *Id.* at § 2502 (2), The Act also expands "opportunities for the commerce of the United States in international trade." ." *Id.* at § 2502 (3); and improves "the rules of international trade..." ." *Id.* at § 2502 (4). The Act endorses and accepts particular trade agreements,  and regulatory mechanisms to implement these agreements. The covered agreements are listed at 19 U.S.C § 2503 ( c ).  At subsection ( c) (3), The Trade Agreement Act specifically notes its application to the Agreement on Government Procurement. 19 U.S.C. § 2503 © (3) (1979).

16

31.    The World Trade Organization Government Procurement Agreement, allows industries from the member countries to freely participate in government procurement on equal footing with domestic companies in participating countries. The United States has determined that this agreement shall apply to procurement at most of its agencies, including but not limited to the General Service Administration (hereinafter GSA), the Department of Justice, and the Department of Defense.

32.    The defendants' contracts are covered by the Trade Agreements Act, and the United States Government is prohibited from purchasing end-products that originate in non-designated countries, except under limited circumstances.

33.    FAR 25.11 © )(1) states that clause 52.225-5 shall be inserted in any "solicitation or contract valued at $175,000 or more, if the acquisition is covered by the WTP GPA." Consistent with this, Defendants' contracts incorporated FAR Clause 52.225-5, entitled "Trade Agreements" and required each Defendant to execute the FAR 52-225-6 Trade Agreements Certificate.

34.    Dollar thresholds, based upon the total dollar value of the procurement, were established to mark the point at which the WTO GPA restrictions would begin to apply. *See*, FAR Subpart 25.402   The threshold is adjusted every two years.  In 2007, the TAA threshold for WTO GPA products

17

was $193,000.00. It was raised to $194,000.00 on January 15, 2009. 74 F.R. 2745

(January 15, 2009).   If, in any given 12 month period, "recurring or multiple

awards of the same type of products" are expected, then the threshold is computed

by calculating the total of the projected annual awards. FAR 25.403 (b)(3). Simply

put, it is based upon the projected sales for the calendar year.

35.   For these defendants, each annual period had sales greater than

$193,000.00, and therefore the TAA threshold was always met, and the TAA

applied to these defendants at all times.

36.   FAR 52.225-5 defines critical terms such as "Designated Country."

FAR 52.225-5 (a).   The clause also identifies the countries that are not considered

to be "designated," by not including them on the list. The People's Republic of

China, Malaysia, Thailand, and the Philippines fall into the latter category, and

therefore they are not designated countries. FAR 52.225-5 also states that the

"designated country end product" means a product produced in one of the listed

countries. *Id*

37.   FAR 52.225-5 states that in most instances, the contractor is prohibited

from *delivering* products under the contract that are not US made or from

designated countries.  FAR 52.225-5 (b)  [Emphasis Added] At subsection (b), the

clause asserts:

18

The Contracting Officer has determined that the WTO GPA and FTAs apply to this acquisition. Unless otherwise specified, these trade agreements apply to all items in the Schedule. *The Contractor shall deliver under this contract only U.S.-made or designated country end products except to the extent that in its offer, it specified the delivery of other end products in the provision entitled "Trade Agreements Certificate." Id.* at subsection (b).[Emphasis Added.]

38.     The Trade Agreements Certificate is FAR 52.225-6, which by the terms of FAR 25.11 (c) (2) is required to be completed each time that FAR 52.225-5 is used.   FAR 25.1101 (c)(2).  This certificate has two parts, Subsection (a) and Subsection (b). Contractors or vendors executing FAR 52.225-6 (a), "certif[y] that each end product, except those listed in paragraph (b) of this provision, is a U.S.-made or designated country end product as defined in the clause of this solicitation entitled 'Trade Agreements.'" FAR 52.225-6 (a).   Under subsection (b), the contractor must list with particularity all of those end products that *are not* U.S. --made and/or were not produced in a designated country. See, FAR 52.225-6 (b). [Emphasis added]

39.     Information about the country of origin of the end product is material to the contracting official because he does not have the authority to purchase a WTO-GPA end product that is not U.S.-made or from a designated

country except under extremely limited circumstances.  Moreover, at all times relevant herein, the FAR Clause 52-225-5, has been included in the contracts between the United States and the Defendants, and Defendants have certified compliance as a condition of doing business with the Government. FAR 25.501(b) allows the contracting officer to "rely on the offerer's certification of end product origin when evaluating a foreign offer."

40.     FAR 25.502(b) specifically addresses the procedures for a contracting officer to follow when dealing with acquisitions covered by the WTO GPA. Contracting officers must "consider only offers of U.S.-made or designated country end products, unless no offers of such end products were received." FAR 25.502 (b)(1). Once the contracting authority identifies the eligible offers, he must give equal consideration to end-products from the U.S. and designated countries and make the award based upon the lowest price. FAR 25.502 (b)(2).  Only when there are no offers of U.S-made or designated country made end products, can the contracting officer then buy the foreign products.  FAR 25.502 (b)(3). In addition, it is important to note that the contracting officer must apply the evaluation procedures of FAR Subpart 25.5 to "each line item of an offer unless the offer or the solicitation specifies evaluation on a group basis," FAR 25.501(a), and the contracting officer must "identify and reject offers of end-products that are

20

prohibited." FAR 25.501 ©. Even if the offer specifies that it is Group Offer based upon all of the items in an offer or a series of line items, it must be rejected if it contains prohibited end products, and the acquisition is covered by the WTO-GPA. FAR 25.503 (a)(2).

41.   Read together, FAR 52.225-5(b) and FAR 25.502 (b) severely reduce the likelihood of any foreign product from a non-designated country reaching a federal facility. If the vendor does not list the foreign item as originating in a non-designated country pursuant to FAR 52.225-5 (b) and FAR 52-225-6 (b), the vendor cannot "deliver" the product to the Government.

42.   The use of the word "deliver" suggests that even if a contracting officer mistakenly purchases such an item, the vendor has an independent obligation not to deliver it, if the vendor failed to properly identify the product and its country of origin under FAR 52.225-5 (b) and FAR 52-225-6 (b).

### E.   **Buy American Act**

43.   Similarly, the Buy American Act limits the ability of contractors to supply or provide,  end use products to the Government.  Products supplied to the Government must be  manufactured in the United States, or supplied by US companies without substantial transformation.

44.    At 41 U.S.C. §10a, the Buy American Act provides that,  "... only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States, shall be acquired for public use. "

45.    However, the DFARS permits US companies to provide supplies to the Government if those products are purchased from certain countries that have trade agreements with the U.S.   China is not one of the countries whose products may be supplied to the US.  See, DFARS 225.872-1.


F.    **DFARS Ball  Bearings  Restrictions**

46.    The Defense Department FAR Supplement has restrictions on the acquisition and sale of ball and roller bearings that are not manufactured in either the United States or Canada.  DFARS 225.7009-3, and 252.225-7016.

47.    The Tobyhanna BPA contract specifically includes the DFARS restriction on the acquisition and sale of ball and roller bearings into the language of the contract.

48.    As a result, any items sold to the Government, under the Tobyhanna BPA contract, may not include ball and/or roller bearings that are manufactured

22

outside of the United States and Canada. The exact products include ball bearings and bearing components (including the bearing element, retainer, inner race or outer race).

The ball bearings and/or roller bearings in question include those sold as end products, or as components of end products. The restriction does not apply to commercial components of a noncommercial end product; or commercial or noncommercial components of a commercial component or a noncommercial end product.

## 2.   **FACTUAL BACKGROUND TO THE FALSE CLAIMS AT ISSUE**

49.   Defendant DHS manufacturers deployable rapid assembly shelters, and other shelters and support equipment used by, among others, Army units on assignment in military zones. Defendant DHS also manufactures, and repairs, specialty equipment, such as trailers, and computerized control centers; and purchase and resells equipment, such as television projectors, for use by military and other government purchasers.

50.   Defendant DHS has entered into several contracts with the Federal government over the course of the past twenty years. Most of these contracts are with the GSA, or DOD. The main Federal governmental contract (hereinafter,

"contract 1") is a MAS contract, GS-07-F-8645C, that has existed in some form since September 1, 1995. Under this MAS contract (and stand alone contracts that were also known as "Blanket Purchasing Agreements," or "BPAs;" and "Indefinite Delivery, Indefinite Quantity Agreements," or "IDIQ" contracts), the Government has purchased products, parts and supplies from defendant DHS, and its subsidiaries, either by direct contract or as a subcontractor with other prime vendors.

51.    The second Federal contract (hereinafter, "contract 2") was an IDIQ (indefinite delivery, indefinite quantity) contract with the Defense Supply Center, Philadelphia ("DSCP"). This contract was entered into in 2005, and just recently expired in 2009, when it reached it ceiling of $279 million. This contract was identified as SPM 10005D8060.

52.    Since that expiration, defendant DHS has been supplying the same items to the Federal government under the Tailored Logistic Support ("TLS") program, as a subcontractor to several firms. The main contract holders for which defendant DHS is a subcontractor in this program include Source One, Atlantic Diving, Amron, and TSSI (Tactical and Survival Specialties, Inc.)(collectively, referred to "contract 3"). In each of these subcontract situations, defendant DHS produces the products required under the contracts, and the Government

24

contractors– Source One, Atlantic Diving, Amron, and TSSI – are merely pass-throughs, adding nothing to the finished products.  In the case of products produced under contract 3, the actual products are delivered from defendant DHS warehouses directly to the Government.

53.    Defendant DHS is aware that the products produced under this subcontract are being produced for use by the Federal government, and that the funds used to pay for defendant DHS' products are supplied by the Federal government.  In the past nine months, Source One has obtained over $50 million in revenue under its contracts with the Government where defendant DHS is the subcontractor.

54.    Defendant DHS also supplies products to the Federal government as a subcontractor to Northrop Grumman, for products supplied out of Redstone Arsenal, Huntsville, AL (hereinafter, "contract 4").  The ceiling for this subcontract is $240 million.  Defendant DHS has been authorized to perform up to $192.7 million of work, for work to be completed in August, 2011.  Of this $192.7 million in work awarded to defendant DHS, approximately $162 million of the work has been completed, and approximately $30 million of the work has yet to be performed.  Defendant DHS is aware that all of the products produced under this

contract are supplied to the Federal government, and that the funds used to pay for defendant DHS' products are supplied by the Federal government.

55.    Defendant DHS also entered into a Blanket Purchasing Agreement ("BPA") contract with Tobyhanna Army Depot (hereinafter, "Tobyhanna,"), Tobyhanna, PA (hereinafter, "contract 5"). This contract began as bulk orders for defendant DHS' products.  The contract was modified to include repair services, for repairs of defendant DHS' equipment in the Government's possession, that were in theater.  Contract number 5, identified by the Government as Contract number W25G1V-06-A-0438,  had a ceiling of $5 million.  By agreement, the Government, by and through Tobyhanna, paid the defendant DHS $7 million under this contract.

56.    Each of these contracts is subject to Federal government contract provisions, required under the Federal Acquisition Regulations, and specific contract requirements.  Each contract is the subject of Small Business Administration set asides, for businesses eligible under SBA regulations.

GSA FAR requirements provide that GSA, or agencies ordering under the GSA schedules, receive the best price offered by defendant DHS. These purchases are also subject to prompt pay discounts. These contracts were

26

negotiated with freight either specifically included; or specifically excluded as an additional cost item, to be charged over and above the contract rate overhead.

57.   The contracts, both direct contracts and subcontracts, require defendant DHS to comply with Environmental Protection Agency, Buy American Act, and Trade Agreement Act requirements and regulations in the production and sale of their products.

## C.   **FALSE CLAIMS UPON THE FEDERAL GOVERNMENT**

### 1.   **SBA Violations**

58.   Defendant DHS won contracts one through four, including the subcontract under the Northrop Grumman contract, under an SBA set aside for small businesses. These contracts were subject to the SBA guidelines under 13 C.F.R. Part 121, related to small business size. Defendant DHS violated the False Claims Act by falsifying its size, in order to win SBA set asides.

59.   The SBA determines size of a business based upon the North American Industry Classification System ("NAICS"). The SBA size determination takes into consideration both the size of a particular business, and its affiliates. At 13 C.F.R. §121.103, the SBA notes that

Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists.

Under NAICS standards, all defendant DHS contracts are classified as 314912, or "Canvas and Related Products Mill," and subject to limitations of being under 500 employees.

60.    In actuality, defendant DHS has in excess of 700 employees, because its affiliates, as defined by the SBA, include all of the companies which defendants DHS, Prusmack, Cohen and Weinstein control.

61.    Defendant DHS has over 500 employees.  Defendants admitted in its March 8, 2010, letter to the SBA that DHS had then at least 497 employees.

62.    Defendants Prusmack and Cohen control AIL, APOGEE, AIM, and USA Sevens/ Rugby Magazine.  Defendants Cohen and Weinstein control Southeast Capital.  Defendant Prusmack  controls Ducts Unlimited.  Collectively, these entities have more than 200 employees.

63.    Upon information and belief, the businesses Source One, Atlantic Diving, Amron, and TSSI should also be considered "affiliates" of defendant DHS.  Defendant DHS is a subcontractor to these businesses, in Government contracts.  In each of these subcontract situations, defendant DHS performs the

28

total contract, develops and/or builds the requisitioned items, and then delivers

the completed product to the Government. In each of these situations, companies

Source One, Atlantic Diving, Amron, and TSSI act as pass throughs for the work

completed by defendant DHS.

The businesses that are under contract to the Government, with defendant

DHS as the subcontractor, do not make any changes to these products before they

are delivered to the Government. These businesses, and defendant DHS, lack a

clear line of separation between themselves and defendant DHS. See, 13 C.F.R.

§121.103(g).

64.    Ducts Unlimited is, for SBA purposes, an affiliate of defendant DHS.

When former officers and employees of one company form a second, new

company, that second company is considered an affiliate if the new company is in

essentially the same industry, and relies upon the old company for contracts or

financial or technical assistance. 13 C.F.R. §121.103(e), (f), and (g). Ducts

Unlimited's officers and managerial employees are former employees of defendant

DHS, or relatives of officers of defendant DHS. Ducts Unlimited is a

subcontractor to defendant DHS in defendant DHS's federal work. Therefore, for

purposes of SBA rules, Ducts Unlimited and DHS are affiliated.

65.    In February, 2010, the SBA requested defendant DHS' employee information, to confirm DHS' qualification under NAICS code 334310.  This NAICS code, for the production of "audio and video equipment manufacturing," requires a company to have less than 750 employees.  However, defendant DHS' business operations and contracts actually place defendant DHS in NAICS code 314912, or "canvas and related product mills."  Under code 314912, defendant DHS, in order to qualify as a small business concern, may not have more than 500 employees.

Defendant DHS, in its SBA response, admitted that the majority of its business, 84%, fell under NAICS code 314912.  DHS also admitted that its receipts under code 314912 were at least $183 million.

66.    In its responses to the SBA inquiry, defendant DHS admitted that it had 525 employees.  This is twenty five employees over the 500 limit.  However, this response did not include all of the employees of defendant DHS' affiliates, AIL and AIM, Agogee, USA Sevens/ Rugy, Ducts Unlimited, Southeast Capital, or the contractors of contract 4.  Those affiliates, by simple internet search, have over 200 employees.

67.    These businesses are controlled by the same persons as defendant DHS.  AIL, AIM, and Apogee have defendant A. Jon Prusmack as the Chief

Executive Officer, and Irving Cohen as a president and officer.  On the AIL

website, they acknowledge that DHS is a part of the same company.  Indeed, both

companies are headquartered out of the defendant DHS offices.  Defendants

Cohen and Weinstein control Southeast, and operate it out of the defendant DHS

worksite.

      68.    Defendant DHS' response to the SBA regarding the number of

defendant DHS employees did not include the employees of Southeast CEG.  This

response to the SBA regarding the number of defendant DHS' employees did not

include the employees of Ducts, Unlimited.  This response to the SBA did not

include employees of The Carlyle Group.

      69.    In its responses related to Government requests for proposals on

contracts one through five, and in its award of contracts, defendant DHS, by and

through defendants Prusmack, Cohen and Weinstein, submitted responses, which

were (upon information and belief) certified, wherein they stated that defendant

DHS was a small business under 500 employees.  This certification, or statements

supporting this allegation, entitled defendant DHS to small business set asides for

the MAS, IDIQ, and DOD contracts, and subcontract opportunities.

The exact dates of these submissions for each contract or subcontract to the Federal government are unknown to Ms. McKinney, but are known by the defendants.

70.    Defendants also informed each contractor, to whom defendant DHS acted or acts as a subcontractor, that they were qualified as a small business of under 500 employees.  These same certifications were made by each contractor to whom defendant DHS served as a subcontractor, and allowed these contractors to win Federal contracts with SBA set asides based upon SBA guidelines for small businesses.

The exact dates of the contractors' submissions for each contract to the Federal government are unknown by Ms. McKinney, but are known by the defendants.

71.    These submissions were false, as the company and its affiliates have over 700 employees.  Defendants caused these certifications to be signed,  with knowledge of their falsity.  Therefore, any submissions made at the time of contracting, including in submissions made, or caused to be made,  from 2004, 2005, 2006, 2007, 2008, 2009, and 2010, were false.

72.    The contracts between the Government and defendant DHS that were subject to SBA set asides for businesses under 500 employees, were let under false

pretenses, and are therefore void. Compliance with SBA regulations is material to the Government's decision to contract with, and pay, the defendants.

73.     The contracts between the Government and contractors, in which defendant DHS was a subcontractor, that were subject to SBA set asides for businesses under 500 employees, were let under false pretenses, as defendant DHS has over 500 employees. These contracts are therefore void. Compliance with SBA regulations is material to the Government's decision to contract with, and pay, the contractors to whom defendants were subcontractors.

### 2.     <u>False Claims Regarding Contract Price Requirements</u>

74.     Wide Area Work Flow (WAWF) is a computer, paperless, contracting application designed to eliminate paper from the receipts and acceptance process of DoD c contracting. The goal of WAWF is to enable authorized Defense contractors, and DoD personnel, the ability to create invoices and receiving reports, and access contract related documents.

75.     In the traditional DoD business method, three documents are required to make a payment - the contract, the receiving report and the invoice. Each document was processed individually as it arrived. Information was then manually keyed in to the payment system. Using WAWF, all of the required documents are

created online, and electronically. Electronic documents are shared, eliminating the need for paper, and redundant data entry. Data accuracy is increased and the risk of losing a document is greatly reduced.   Contractors have electronic options for submitting invoices and receiving documents.

76.   WAWF supports DoD's efforts to reduce unmatched disbursements in the DoD receipt, acceptance, entitlement and payment process through data sharing and electronic processing. The benefits to DoD are global accessibility of documents, reduced need for re-keying, improved data accuracy, real-time processing, and secure transactions with audit capability. Vendors benefit by the capability to electronically submit invoices, the reduction of lost or misplaced documents, and the ability to access online contract payment records.

### A.    Negotiated Price Discounts

77.   At the GSA Manual Section 552.238-75, Price Reductions, the Government requires that the prices charged to the Government, in contracts under the FAR, be set in relation to prices that a vendor offers to its commercial customers. The Manual permits the Government to identify, with the contractor, a category of customers that will form the basis for the Government's prices. The

parties then negotiate the discount relationship of the Government's prices to that category of customers.

78.    As part of this negotiation, the Government requested that defendant DHS identify its prime customer purchasing products similar to the Government (same products and quantities). This customer identification is done for purposes of creating a discount relationship between that customer's prices, and the prices offered to GSA. Defendant DHS supplied its DRASH commercial price list, showing the "manufacturer's suggested retail price" (hereinafter, "MSRP") of defendant DHS' products and supplies sold to commercial customers.

79.    As part of this negotiation, Defendant DHS identified the Defense Supply Center, Philadelphia ( also known as "DSCP"), as its largest customer and contract, for purposes of setting a price with the Government for current contracts. The Government required a twenty percent (20%) discount off of the "MSRP" offered by the contractor. Since DSCP, identified by the defendants as its prime customer, was a Government agency, GSA agreed to accept the same prices for its purchases as the prices defendants offered to DSCP. These prices offered to DSCP, according to defendants, were twenty percent (20%) less than the MSRP offered to DHS' commercial, non-governmental customers.

35

80.     In actuality, defendant DHS' supplies far more products to Northrop

Grumman, on the commercial and government side, than to DSCP.  Therefore,

defendant DHS improperly and falsely identified DSCP as its prime customer, for

purposes of negotiating a price with the Government.  The significance of this

improper identification is that defendants are required to offer the Government

twenty percent (20%) discounts off of the best price offered to a commercial

customer.  The defendants knowingly misidentified its largest customer, in order

to avoid offering a discount to the Government.

81.     Defendants offer large commercial clients, like Northrop, a twenty

percent (20%) discount off of the price that defendants offer the Government.

Defendants negotiated the prices of their contracts with the Government in bad

faith, in that the defendants knowingly failed to identify their largest commercial

client as Northrop, and failed to disclose that DHS offers Northrop a discount off

of the Government prices.  Therefore, the Government is not receiving the "best

price" from defendants, as required by the contracts between the parties.

82.     The FAR, and the contracts, also require defendant DHS to notify the

Government of any "price reductions" to customers, if such customers formed the

basis of the agreed upon prices; and price reductions to commercial clients.

Defendant DHS is required to notify the Government if DHS "grants more

36

favorable discounts or terms and conditions than those... upon which the contract

award was predicated; or grants special discounts to the customer that formed the

basis of the award, and the change disturbs the price/ discount relationship ...that

was the basis of the award."

83.     Since the point in time when defendants falsely notified the

Government of the best customer, defendants have offered discounts to Northrop,

among other commercial customers, without notifying the Government of the

existence of these discounts.  These discounts were offered to Northrop in 2005

and 2006; and from 2007 to present.

84.     On or about May 1, 2007, defendant DHS was audited by the GSA as

part of a routine GSA audit.  The auditors discovered that defendant DHS was not

providing GSA with its best prices.  GSA notified defendant DHS, via emails in

July and August, 2007, that the Government believed that DHS was not giving its

best prices to GSA.   The GSA stated its intent to renegotiate its prices with

defendant DHS, on all of the contracts between the Government and defendant

DHS.   In the late summer, 2007, the Government, by and through the U.S. Army,

requested an extension of the contracts, regardless of price issues, because of the

agency's need for defendant DHS' products.

85.   In response to this chain of events, on December 10, 2007, DOD agreed to an extension of its contracts with defendant DHS.  Defendants, by and through defendant Weinstein, agreed to incorporate into its practices, safeguards to insure accurate reporting of discounts offered to commercial customers; management controls, and compliance responsibilities, to insure that the Government received the best prices from defendant DHS.  The DRASH Commercial price list formed the basis of this negotiation.  The prices include a twenty percent (20%) discount off of the MSRP for DRASH products and supplies; and freight was included in the overhead.

86.   After the Government and defendant DHS entered into this agreement, the TLS contract (also known in this Complaint as contract 4) became the basis of the contract award.  Defendant DHS based its contract prices with the Government on the prices in the TLS contract, asserting that  the TLS contract is its largest commercial customer.

87.   However, defendants again falsely told the Government that defendants' largest customer was a government contract.  In reality, defendants' largest customer is still Northrop, which purchases over $240 million from defendants each year.  Defendant DHS sells it products to Northrop at a twenty percent (20%) discount, off of the Government's prices.

38

88.   Defendants' discounts to Northrop, or other commercial customers, should trigger a Government price reduction award.   However, defendants do not disclose to the Government the twenty percent (20%) discount offered to Northrop, and knowingly failed to notify the Government that Northrop is actually defendants' largest customer.   This knowing failure was taken by, among others, defendants Jackson, Marrone, and Weinstein.

89.   Defendants knowingly submit claims for payment on their Government contracts, without revealing that the Government is not being offered the defendants' best prices, or that the largest commercial customers are offered discounts off of the Government price.

90.   As a result of these false statements, the claims submitted by the defendants, for payment or approval,  are false.

91.   These false statements materially influence the Government's decisions to contract with, and pay, defendants.

92.   As a result of these false claims, the Government pays monies to the defendants.

### B.   Overcharging the Government  For Freight

93.   Each individual contract between defendant DHS' contracts and the Government specifically state whether the prices include the freight involved in shipping the items.  In those contracts that include freight, freight is to be included in the price and not to be charged as a separate item.  In those contracts that do not include freight, freight is not to be included in the price, and is to be charged (as necessary) in addition to the price, as a separate line item.

94.   In violation of their contract agreements,  defendants include freight as a part of their overhead, for each item produced.  This inclusion of freight in the item price, as part of the overhead, is regardless of whether the contract specifically calls for freight to be included or excluded.

95.   For instance, items ordered under the DSCP contract are specifically contracted to have freight as an additional item.  This is because the DSCP contract calls for the Government to pick up the items ordered pursuant to the contract.  Defendants charge DSCP for freight as a calculated overhead item, even though the Government physically picks up its own products from defendant DHS facilities.

96.   For instance, on August 21, 2009, the Fifth Striker Brigade Combat Team 2 ID ordered products that were given DHS invoice number 17418.  These

40

products were shipped to a DHS warehouse/ regional support facility in Dupont, WA, but the Fifth Striker Brigade was charged $1,931 for the freight on these products. The freight was already included in the overhead, but freight was double charged -- to have these products sent to a DHS warehouse, where the Brigade picked up the products.

This purchase was entered on the WAWF system, and defendant DHS entered the freight as an additional invoice item.

97.   The list of equipment that has freight included in the overhead is usually the lighter weight products; larger products, such as trailers, do not have freight included in the overhead.  Freight is included as part of the overhead on items stored in regional support facilities ("RSF"), which are facilities that defendant DHS maintains near military bases nationwide.  Items stored in RSFs include, but are not limited to,  tents, spare parts, and heaters.

98.   For instance, on October 10, 2009, Tobyhanna ordered items under its BPA contract with defendant DHS, at order number 45184.  These items were shipped to Tobyhanna on December 18, 2009, under defendant DHS invoice number 18981.  The items in this ordered included s-hooks, and strut assemblies. The items were paid for by a Government credit card.  The sales amount total was $13,824.31, and $145.20 was charged for freight.  Freight was already factored

41

into the overhead, and therefore the Government was charged twice for freight on this order.

99.   On March 10, 2009, defendant DHS invoice number 15224, DHS supplied products to the 4th Infantry Brigade Combat Team that were delivered to the DHS RSF at Killeen, TX.  The $140 order was charged $21 in freight.

100.   Defendants DHS has, upon request, shipped items to RSFs, with the Government requesting that it pick up the items at the RSF.  In each of these situations, defendant DHS ships the items to itself, through one of its facilities, yet charges the Government for the costs to ship the items to a DHS facility.  This freight charge, for shipping from DHS to DHS, is in addition to the freight already part of defendant DHS' overhead charges.

101.   After much email discussion in May, 2010, defendants agreed not to charge additional freight on items shipped to RSFs but picked up at the RSF by a Government employee.  These emails were between Ms. McKinney and, among others, defendants Jackson, Bohrman, and Weinstein.  Defendant Weinstein admitted that he knew defendant DHS was overcharging the Government for freight, but believed that defendants would never be caught for this overcharge.

102.   These overcharges for freight are a violation of the defendant DHS' contracts, and amount to false claims for the freight charges.  Defendant DHS is

42

double charging the Government for freight, and knowingly violating both its contractual obligations and its obligations under Federal law.

103.   Compliance with contract terms and conditions is material to the Government's payment to the defendants.

104.   Knowing disregard of its obligations to the Federal government, and the creation of a false claim to the Government based upon this knowing disregard, amounts to a false claim to the Government.  Defendants have knowingly disregarded their obligations under the contracts, and falsely billed the Government for freight on numerous occasions.

## C.   Failure to Offer Prompt Pay Discounts

105.   In its GSA contracts, defendant DHS agreed to offer discounts for prompt payment-- that is, payments made within twenty days of products' delivery. The discounts amount to two percent (2%) discount for payments made within ten days of delivery, and one percent (1%) discount for payments made within twenty days of delivery.

106.   These prompt pay discounts are contained in the contracts, and as part of the WAWF program.  WAWF invoices and contracts highlight vendor offered discounts so that the DoD personnel are aware of existing discounts.

107.   Under the GSA contracts, the Government's agencies contact defendant DHS directly to order particular items.  Multiple persons, on behalf of the Government, are permitted to contact defendants, directly or through the WAWF , to order particular items covered by the Government's contracts.

108.   Prompt pay discounts should be revealed, through the WAWF, to each individual placing an order on behalf of the Government.  In addition, the accounts receivable clerks at defendant DHS are aware of the prompt pay discounts, and should be placing such discounts into the invoices related to the purchases via the WAWF.

109.   On numerous occasions, employees of defendant DHS fail to notify the Government employees of the prompt pay discounts, and fail to apply this discount to the invoices for Government orders.  As a result, the Government is overcharged when it pays promptly.

110.   For example:

a.     On August 18, 2009, DFAS-LVFP F87100 of Limestone, ME,  placed order number 44604, for delivery to Fort Monroe, VA.  This order was given customer purchase order number FA4800-09-F-0132.  This order was for a large tan shelter with a black trailer.  The total order amount, including freight, was for $41,690.00.  On its face, the invoice does not offer any discount for prompt pay,

44

and identifies the payment terms as "Net, 30 days." No prompt pay discount was offered.

b.      On December 19, 2008, CEEC NAVEOTECHDIV, USN, placed an order for a light set, and a shelter system; order number 42218. The invoice, invoice number 15137, dated February 27, 2009, was for $14,038.00, with payment terms of "Net 30 days." Had the defendants offered, as required, a two percent discount for prompt pay, the Government would have saved $280.76 on these two items.

c.      On April 30, 2009, 3rd Intelligence Battalion placed an order for a four fixture light set, order number 43470. The invoice, number 15953, dated May 11, 2009, was for $2,650.00. The net terms state that the payment was made by credit card, which means that payment occurred immediately. Despite this immediate payment, no prompt pay discount occurred, costing the Government an additional $53.00.

111.   There are several hundred additional examples of overcharging the Government for purchases. The overcharges are knowing disregards of defendants' obligations to the Government. Compliance with contract terms is material to the Government's decision to contract with, and pay, the defendants. Each of these knowing overcharges is a false claim upon the Government.

45

### 3.     Violation of EPA Regulations In Improper Use of JG Engines

112.   The U.S. Army, Communications Electronics Command ("CECOM"), Aviation and Missile Command ("AMCOM") entered into a contract with defendant DHS. This contract calls for the production of at least 175 Standardized Integrated Command Post Systems ("SICPS") of the Trailer Mounted Support Systems ("TMSS"), Large, as produced by defendant DHS. These SICPS utilize a PU-823/T, Power Plant, Utility, that, under its original design, is powered with an Isuzu 4JG1TPV-01/02, 58 bhp diesel engine ( hereinafter, "Isuzu engines"). The contract calls for 1,200 Isuzu engines, with an additional 50 Isuzu engines to support the fielded fleet, with a stop date of January 31, 2013.

113.   These engines, part of the original design, met the Environmental Protection Agency Tier II nonroad emissions standards at the time of initial contracting. However, on January 16, 2009, EPA issued a change in the standards of emissions, under the Vehicle and Engine Certification Requirements of the Clean Air Act. These changes resulted in the classification of Tier III and IV emissions standards.

114.   The Isuzu engines could not meet the new Clean Air Act standards. On June 24, 2009, the Army, through the Command Post Systems and Integration (CPS&I) Product Office, requested and received a National Security Exemption

46

from EPA, in order to continue production of the products under the contract. This NSE was given only for the Isuzu engines used in this particular SICPS contract.

115.   Defendant DHS also uses these same Isuzu engines in other products that it sells to the Government, including the TMSS Large Green; the TMSS Large Tan; the TMSS Large IPT Tan; the TMSS Large IPT Green; HP-2c/288 IPT Tan; HP-2c/288 IPT Green; HP-2c/338 Green; HP-2c/338 Tan; HP-4/338 Tan; HP-4/338 Green; HP-4/3312 Tan; HP-4/3312 Green; HP-4G/33Tan; and HP-4G/33 Green.

116.   All of these Isuzu engines are used pursuant to contracts, wherein defendant DHS certified that the parts it was supplying were compliant with Federal regulations and standards, including the EPA.  Defendant DHS was aware that its use of the Isuzu engines, for uses other than the SIPCS contract given an NSE exemption by EPA, was improper, and in violation of EPA regulations.

117.   Despite this knowledge, defendant DHS placed these engines into other products, that were then sold to and shipped to the Government.  The Government paid defendant DHS for these engines, as part of other components.

118.   From November, 2009, to April, 2010, the Government paid $18,440,029.00 for products which contained the improper, and not exempted,

Isuzu engines.  Examples of such acquisitions include, but are not limited to, the

following:

| Date, Invoice | Price per item | Product | Customer | Serial No. |
|---|---|---|---|---|
| 12Feb2010 #19427 | $222,000 ea; five products | TMSS Large Tan, SY201-0002T | W81A1T8535 5AN03BG | TMSS-00029191; 00029192; 00029193 |
| 26 Feb 2010 19538 | $222,000 ea, six products; | TMSS Large Tan | | TMSS-00020207; 00029208; 00030314; 00020315 |
| 28 Dec 2009 | $94,132.00 ea; two products | HP-4/3312 Tan | Tripler Army Med Center | TRLASY-00004050; TRLASY-00004051 |

119.   From June, 2009, to present, defendant DHS knowingly supplied

these engines under Government contracts, or as a subcontractor.  During this time

period, defendant DHS knowingly submitted claims for payment to the Federal

government for these engines, or for products that contained these engines.  These

claims were either submitted to the Government, or to a Government contractor,

with the intent that these submissions would be paid by the Federal government.

The Government actually paid each submission.

120.   Over this time period, defendant DHS sold the Government over $27 million of products containing these non-compliant Isuzu engines.  Defendant DHS' gross margins on these products was over $14 million.

121.   Defendant DHS sold the Government these non-compliant Isuzu engines, and/or sold, to the Government, products which contained these non-compliant Isuzu engines.

122.   Defendant DHS submitted to the Government false claims for payment, for the non-compliant Isuzu engines, or products which contained the non-compliant Isuzu engines, with knowledge that these engines were not compliant.

123.   The Government paid defendant DHS for these non-compliant Isuzu engines.

124.   The knowing use of compliant engines in its products is material to the Government's decision to contract for, and pay for, the product.


4.   **Violations of the BAA/TAA by defendant DHS**

125.   All of the contracts between defendants and the Government require that the defendants comply with the Trade Agreements Act, and the Buy American Act.

126.   Defendants were aware that there may be issues with their compliance with the TAA, and the BAA.

127.   After some email discussions, defendant Jeff Jackson was aware that cables, and low cost projectors, were manufactured in China, and therefore did not comply with the TAA/BAA.

128.   The parts identified as non compliant, include but are not limited to: BP 900A022, BP 900A245, BP900A246, BP 900A247, BP900A248, BP 900A249, BP 900A250, BP 900A251, BP BP900A252, BP900A258, BP900A237, BP900A238, BP900A239, BP900A241, BP900A243, BP900A213, 1002722, 1004884, 1006531, 1007266, 1005476, 1005478, and BP 900 A0156 (an Azden Speaker).

129.   All of these parts are manufactured in China, and are therefore not compliant with BAA/TAA.

130.   Defendant Jeff Jackson was aware, as of an email dated March 15, 2010, that these parts were not BAA/TAA compliant, but did nothing to remove these products from use by defendants DHS under Government contracts. Defendant Jackson and Bohrman, or any other defendant, failed to notify the Government that non-compliant parts were contained in products sold to the Government; or to obtain these parts from other, compliant, sources.

50

131.   These non compliant parts were sold to the Government from March, 2010, to present, either individually, or as part of other end products sold to the Government, under all of the defendant DHS' contracts.

132.   Defendant DHS knowingly submitted claims for payment or approval for these noncompliant products, and were paid for the products containing these noncompliant products.

133.   Compliance with TAA/BAA is material to the Government's decisions to contract with, and pay, the defendants.

### 5.   Intentional Violation of Contract Terms and Overbilling.

134.   The Tobyhanna BPA contracts were first entered into in 2005.   The contracts expired in 2009.   These contracts were for goods and services, including maintenance and repair work to be performed on goods purchased under the BPA, located in theater and in need of service.

135.   As part of the Tobyhanna BPA contracts, defendants were required to only use ball bearings that were manufactured in the United States or Canada. Defendants were aware of this requirement regarding ball and roller bearings.

136.   Beginning in February, 2010, Ms. McKinney became aware that the roller bearings and ball bearings being sold under the Tobyhanna BPA were not

manufactured in the US or Canada. Defendants were aware, by email conversations between Ms. McKinney, defendants Weinstein, Jackson, and Bohrman, that approximately forty (40) products sold by defendant DHS were implicated in this restriction, including some of the tent products.

137. These ball bearings and roller bearings were also being supplied, under the Tobyhanna BPA, as an end item.

138. At a minimum, defendants submitted requests for payment on these ball bearings as an end product, in an amount in excess of $3,500. For instance, some of these ball bearings as end products were ordered by Joseph Mozaleski of Tobyhanna on March 23, 2009, given BPA call number 0295, and delivered on April 29, 2009. For instance, some of these prohibited products were ordered April 20, 2009, under invoice number 15297, order number 43351, with delivery date May 11, 2009. Note that these small items were also charge freight; and no prompt pay discount– the payment was made via Government credit card– was offered.

139. The repair and service work, provided for under the Tobyhanna BPA contract, is performed at the site where the product is located in theater. Defendant DHS incurs costs to transport personnel to the site in theater where the products are located, including the hourly rate defendant DHS pays its technicians to travel to

the off site location.  According to the contract modification for the performance of services, the costs associated with the technician's travel time is included in the cost overhead.

140.   Despite this agreement, that technician travel time is included in overhead,  defendant DHS billed the Government for the time taken for personnel to travel to the site, at the same rate as that technician was billed for services provided.  This billing occurred from 2004, up to and until November, 2007.  Upon information and belief, this billing for travel time may still be ongoing.

141.   For instance, on September 26, 2005, defendant DHS charged the 24th MEU for travel labor on invoice number 3847, order number 3578, at a rate of $200.00 for four hours of travel, when that technician's travel time was already built into the overhead rate charged for repairs.

142.   For instance, on November 13, 2006, defendant DHS charged the 526th and 518th Engineering DET, on invoice number 6636, order number 6105, for technician travel time, at a rate of $275.00 for five hours of travel.

143.   On or about October 15, 2007, defendant DHS employees began preparing a quote for repair services to be performed at Fort Lewis, WA.    In a series of emails between October 15, 2007, and November 8, 2007, defendant DHS employees discussed the subject of whether per diem, and travel time, could be

charged to the Government as part of these services, and, if so, what rate could be charged.

144.  Ms. McKinney told, among others, defendants Jackson, Bohrman and Weinstein that the technician travel time was included in overhead, and that charging separately for this travel time was double charging, and illegal.

145.  Defendant Weinstein directed Ms. McKinney to submit a charge to the Government that included the full technician rate for time traveling, stating that, if the Government "chose[s] to decline paying it, we will accept that declination." Ms. McKinney refused to submit this request for payment, and was counseled by defendant Jackson that she was obstructing the course of defendant DHS' business.

146.  After November 8, 2007, every repair service proposal that came across Ms. McKinney's desk did not contain a request for reimbursement of technician travel time.  However, Ms. McKinney is without knowledge as to whether defendant DHS, by and through its employees or the other defendants, continued to double charge the Government for technician travel time.

147.  There are many more examples of these false submissions, where defendants knowingly submitted for payment, requests for technician travel time, while under contract for technician travel time to be included  as part of the overhead rate.

### 6.   Defendants' Employment Retaliations towards Ms. McKinney

148.   When Ms. McKinney was hired at defendant DHS, she brought with her a long work history and knowledge of Government contracting, and subcontracting.

149.   As part of her job at defendant DHS, Ms. McKinney was required to sign almost all submissions and certifications to the Government on behalf of defendant DHS.  From almost the beginning of her employment at defendant DHS, in 2007, Ms. McKinney saw problems at defendant DHS related to contract violations that amounted to false claims upon the Government.

150.   Ms. McKinney has been instructed by, among others, defendants Weinstein, Jackson and Bohrman, to submit false claims, and fraudulent documents, to the Government.  Ms. McKinney was directed to stop discussing her "opinion" that particular actions are false, fraudulent, wrong, or illegal.

151.   Ms. McKinney has been instructed to permit other employees to submit documents that Ms. McKinney refuses to submit, due to her concern that these documents are fraudulent.  Ms. McKinney has refused to submit or sign documents she considered wrong, illegal, or fraudulent.

152.   Ms. McKinney was told, repeatedly, by her supervisors, including defendant Jackson, and by company executives, including defendant Weinstein,

that she has a poor attitude, that her conclusions were wrong, that she was too confrontational, and that she was upsetting other employees.  Ms. McKinney has been fired, then rehired; repeatedly counseled regarding her "confrontational" or "disruptive" behavior; and given career counseling to "learn" to be more cooperative.

153.   Despite this counseling, defendants continued to direct Ms. McKinney to create and submit false and/or fraudulent documents, or take improper and illegal positions.  Each time, Ms. McKinney refused to take these actions.

154.   As a result of her refusal to follow the defendants' instructions to mislead or defraud the Government, Ms. McKinney was "laid off," told that the firm's business was restructuring.

155.   Less than two months after Ms. McKinney was laid off, defendant DHS advertised its desire to fill her position on a website.

## COUNT I
## FALSE CLAIMS ACT
### 31 U.S.C. §3729 et seq.

156.   Ms. McKinney incorporates paragraphs 1 through 155 above as if fully set forth herein.

157.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

158.   The defendants submitted claims, that were requests for payment or approval, to the Federal government.  The defendants submitted claims for payment or approval, to a contractor, grantee, or other recipient of Federal funds.

159.   The defendants made, used, or caused to be made or used, claims to get money or property from the Government.

160.   These claims were false.

161.   These false claims were submitted to the Government, with knowledge of their falsity.

162.   These false claims were submitted to contractors, grantees, or other recipients of Federal funds.

163.   These false claims were knowingly submitted for payments or approval.

164.   The falsity of these claims was material to the Government's decision to pay these claims.

165.   The false claims, knowingly submitted to the Government, were paid by the Government.

166.   Defendants were aware that the funds they received were to be spent or used on the Government's behalf, and/ or to advance a Government program or interest. Defendants were aware that the United States Government provides or has provided any portion of the money requested or demanded from the Government, or its contractors, and  were aware that the Government will reimburse such contractor, grantee, or other recipient for any portion of the money requested or demanded.

167.   The defendants' false and fraudulent submissions, and requests for payment, have and had a natural tendency to influence, or be capable of influencing, the payment of funds to defendants.

168.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

169.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, material to a false or fraudulent claim, in violation of 31 U.S.C. §3729(a)(1)(B).

170.   By virtue of the acts described above, Defendants conspired to commit violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(A) and (B), in violation of 31 U.S.C. §3729(a)(1)( C).

171.   Each submission to the Government by Defendants for payment, on goods and services, under its contracts, represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

172.   Each submission to a contractor with the Government, by the defendants, for payment and/or approval, represents a false or fraudulent record or statement and a false and/or fraudulent claim for payment.

173.   Ms. McKinney cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct, as the voluminous records of this conduct are exclusively in the control of the defendants.

174.   The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and fraudulent claims for payment.

175.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  The amount of damages is in excess of $2 million.

## **PRAYER**

WHEREFORE, Ms. McKinney prays for judgment against the Defendants as follows:

A.    that Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

B.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729et seq.;

C.    that Ms. McKinney be awarded all costs of this action, including litigation costs, attorneys' fees and expenses; and

D.    that Ms. McKinney recover such other relief as the Court deems just and proper.

## **COUNT II**
## **FALSE CLAIMS ACT RETALIATION**

176.    Plaintiff realleges paragraphs 1 through 175 as though fully set forth herein.

177.   Section 3730(h) of the False Claims Act provides that "[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section."   31 U.S.C. §3730(h).

178.   During her employment, Ms. McKinney  engaged in numerous lawful acts which furthered her *qui tam* investigation, and ultimately led to this lawsuit. During her employment, Ms. McKinney investigated the fraud described above, told her supervisors, both verbally and in writing that the defendants practices amounted to fraud, and told the defendants that she would not sign documents that she believed would be false claims and false certifications.

179.   As a result of her complaints about false claims and potential frauds, Ms. McKinney was threatened, harassed, and discriminated against in the terms and conditions of her employment.

180.   As a result of her complaints and actions taken in furtherance of her qui tam investigation, Ms. McKinney was terminated from her employment, by

61

way of being "laid off." This "lay off" was done solely as retaliation for Ms.
McKinney's lawful acts.

## **PRAYER**

WHEREFORE, Ms. McKinney prays for judgment against the Defendants as
follows:

A.    that Defendants cease and desist from violating 31 U.S.C. §
3730 (h).;

B.    that this Court enter judgment for Sharon McKinney, and
against Defendants, and award Ms. McKinney reinstatement
with the same seniority status that Ms. McKinney would have
had but for the discrimination, 2 times the amount of back pay,
interest on the back pay, and compensation for any special
damages sustained as a result of the discrimination;

C.    that Ms. McKinney be awarded all costs of this action,
including litigation costs, attorneys' fees and expenses; and

D.    that Ms. McKinney recover such other relief as the Court deems
just and proper.

62

**RESPECTFULLY SUBMITTED,**

**REGINA D. POSERINA**
**PA Attorney ID No. 66486**
**Attorney for Sharon McKinney**
**7415 West Chester Pike**
**Upper Darby, PA 19082**
**(610) 352-0760**
**Email: rposerina@verizon.net**

Filed: January 19, 2011